**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Cr. No. 2:21-CR-20193-SHL** |
| ) | |
| **COURTNEY ALFORD,** ) | |
| ) | |
| **Defendant.** ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S**
**MOTION TO SUPPRESS**

COMES NOW, the United States, by and through Joseph C. Murphy, Acting United States Attorney and Nathan A. Vrazel, Special Assistant United States Attorney for the Western District of Tennessee, and for good cause, respectfully requests that the Court deny the Defendant's Motion to Suppress. In support thereof, the United States submits the following:

## FACTUAL BACKGROUND

On October 13, 2020 around 4:45 A.M., Memphis Police Department (MPD) Officers responded to an aggravated assault 911 call[1] at 255 Flynn Rd. Memphis, TN 38109.  Julia Saine called 911 and told the operator that a man named "Courtney," later identified as the defendant, Courtney Alford, threatened to shoot her.  (Ex 1, at 01:45).  Saine informed the operator that

---

[1] There is a recording of the 911 call, and it is tagged as Exhibit 1 to this response. A DVD with the recording will be delivered to the Court's chambers.

police had to be called to the residence not too long ago to move out another girl from the address. *Id.* at 03:43.   At the same time Saine was relaying the information to the operator, police dispatch was relaying it to responding officers via radio transmissions.[2]   The dispatcher informed officers that a suspect named Courtney was "putting [Saine] out of the residence" at 255 Flynn Rd. and that he also pulled a gun on her in the process.   (Ex 2, at 00:01).   The dispatcher next told police that Saine stated the suspect had threatened to shoot both her and police on scene.   (Ex 2, at 02:03). Police dispatch then informed officers that police had been called to this residence "previously regarding the same subject."   (Ex 2, at 04:45).   Finally, the dispatcher communicated that the 911 operator heard the suspect yell at Saine that he was going to shoot her in the face.   (Ex 2, at 07:20); *see also* (Ex 1, at 08:10).

Jacob Martin[3] and Farrell Brassell[4] were the initial responding officers on scene.   Upon pulling up in their shared squad car, Officers Martin and Brassell observed that 255 Flynn Road was a single-story house.   (Ex. 4, at T04:51:00[5]).   As officers approached the house on foot, they saw the defendant on the front steps holding the outer screen door to the house open with his body. *Id.*   The defendant was extremely agitated, yelling about Saine not leaving the residence, and complaining that she had woken him up from his sleep.   *Id.*   Saine could be seen just inside the open front door picking things up off the ground.   *Id.*   Having been informed that the defendant was armed and threatened to shoot Saine and police, Brassell told the defendant to take his hands

---

[2] There is a recording of the police radio transmissions, and it is tagged as Exhibit 2 to this response. A DVD with the recording will be delivered to the Court's chambers.

[3] Officer Jacob Martin's Body Worn Camera (BWC) was activated, and the recording is tagged as Exhibit 3 to this response. A USB with the video will be delivered to the Court's chambers.

[4] Officer Farrell Brassell's Body Worn Camera (BWC) was activated, and the recording is tagged as Exhibit 4 to this response. A USB with the video will be delivered to the Court's chambers.

[5] The citations to the BWC videos will reference the internal time stamps in the right-hand corner of the footage and not the actual runtime of the recordings.

out of his pockets and keep them visible.  *Id.*  The defendant responded by saying that the house was his.  *Id.*  Saine then came to the front door and told police "It's his house. He put me out, but he pulled a gun out on me and everything."  *Id.*

As Brassell and Martin finally arrived at front steps of the house, Brassell asked where the alleged gun was.  *Id.*  The defendant did not answer, but Saine shouted from inside the house, "In his room! I'll show you! I'll show you where it's at!"  *Id.*  Saine was wearing a shower cap, sweatshirt, leggings, and sneakers.  *Id.*  Police observed Saine picking various items up off the ground that had been strewn across the hallway inside the house.  *Id.*  Saine was also carrying a towel, an oversized purse, and a clear plastic bag that she was putting the items from the ground into.  *Id.*  The defendant then placed his hands in his pockets again.  *Id.*  Brassell instructed him to keep them out again and the defendant complied.  *Id.*  Brassell next asked where the gun was a second time and the defendant denied that there was a gun.   (Ex 4, 04:52:25).  Saine, however, responded, "Let me show you. Let me show you. Let me show you. Let me show you where the gun he just pulled on me at. Can I show you?"  *Id.*  As Saine said this, she was motioning with her right hand for officer Brassell to follow her inside the house while she held the bags with her personal items and the towel in her left.  *Id.*  Additionally, while Saine was motioning, she was holding what appeared to be a non-travel-size stick of deodorant in her right hand.  *Id.*

Brassell next asked the defendant, "Who is she to you, man?"  *Id.*  He replied that he had known Saine for years, but they had "just got together like three or four days ago."  *Id.*  In an apparent attempt separate the defendant and Saine, Brassell ordered the defendant to step off of the front steps and go into the yard with Officer Martin.  *Id.*  The defendant did not comply and continued to yell and reiterate that the house was his and that he was trying to get Saine out of it.

3

*Id.* Brassell then grabbed the defendant's arm and brought him into the front yard with Officer Martin. (Ex 4, 04:53:05). Brassell and Martin then cuffed the defendant and detained him. *Id.* At this point, Officers Anthony Weeden and Courtnee Chrestman arrived on scene and began to assist in detaining the defendant. *Id.* As the defendant was being detained, he told police that the residence "ain't nothing but a rooming house." *Id.* Officers Martin, Weeden, and Chrestman then escorted the defendant to a squad car and put him in the back seat. (Ex 3, at 04:53:38).

As the defendant was being put in the back of the squad car, Brassell reopened the front door to the house where Saine was still picking things up on the other side. (Ex 4, 04:53:40). Saine was holding a large bottle of Vagisil and appeared to have a large perfume bottle and other non-travel-size toiletries in her clear bag. *Id.* Brassell asked Saine where the gun was and Saine led him to a bedroom in the back of the house. *Id.* As she was leading him to the bedroom, Brassell could see that there were multiple bedroom units with numbers on them in the house. *Id.* The defendant was staying in unit number three and the unit door was wide open. *Id.* The defendant's unit consisted of a single bedroom with a small closet. *Id.* An approximately five-foot-tall dresser with a television and other items on top of it was in the room and Saine told police that she thought she saw the defendant put the gun in the top drawer, however, after looking Brassell did not find a gun there. *Id.*

While in the bedroom, Brassell observed the defendant picking up more of her personal items from around the room, including a tampon and another large bottle filled with a yellowish liquid. (Ex 4, 04:54:10). Brassell asked saine what her relationship to the defendant was and she replied that they were friends. *Id.* He then asked her, "Are y'all sexually involved, or what?" *Id.* Saine confirmed that were. *Id.* Brassell then asked Saine to step outside the apartment,

however, before she did Saine picked up a few more items including a black grocery bag full of unknown items that was hanging on the closet doorknob.   *Id.*   Brassell then followed the defendant back to the front door of the house.   (Ex 4, at 04:56:05)   As Saine reached the front door she picked something up off the ground and said, "There go my brush."   *Id.*

As they were leaving through the front door, Brassell told Saine, "I'm just trying to see where the gun at. You telling us he pulled a gun, but I ain't found no gun."   (Ex 4, at 04:56:10).   Saine then replied that she was not lying and led police back into the bedroom.   *Id.*   Once there, Saine reiterated that the defendant was standing next to the dresser when she saw him with the weapon.   *Id.*   She pulled an empty gun case from behind the television to prove that she was telling the truth.   *Id.*   Officers Martin, Chrestman, and Brassell then began to go through the various areas of the room looking for the gun.   *Id.*   Police discovered a pistol once Chrestman lifted up the mattress, and Saine confirmed that it was weapon the defendant pulled on her.   (Ex 4, 04:59:30).   Saine and the police then exited the house.   *Id.*   By this time Officers Kenneth Odhiambo and Dartelle Joyner had arrived on scene outside the residence as well.   *Id.*

After finding the gun and exiting the house, Brassell and Martin began asking Saine more questions about her and the defendant's relationship while she stood in the driveway.   (Ex 4, 05:00:23).   Saine then recanted and said she and the defendant had never been sexual.   *Id.*   Brassell began to discuss whether the police report would be classified as a domestic violence case with Officers Odhiambo and Joyner.   (Ex 4, 05:03:35).   Brassell informed them that Saine denied having a sexual relationship.   *Id.*   Odhiambo then pointed out that if she and the defendant cohabitated then it would still be classified as domestic violence regardless of sexual intimacy.   *Id.*   Joyner and Brassell then both agreed with Odhiambo's assertion.   *Id.*   As they were

5

discussing how classify the report, Martin was writing down the home address that Saine gave him as her own, which was not 255 Flynn Road.   (Ex 3, at 05:03:27).   Martin then asked if she lived at 255 Flynn Road with the defendant.   (Ex 3, at 05:04:30).   Saine replied, "No. I was visiting, and I was waking him up to let him know I was fixing to go home." *Id.*   With this new information in mind, Brassell stated that this was not a "domestic" situation after all if she did not stay at the residence.   (Ex 4, at 05:04:40).   Saine also clarified that the prior domestic incident she told the 911 operator about involved another girlfriend of the defendant and not her.   (Ex 3, at 05:14:00).

After taking down the information from Saine, Martin called MPD Sergeant Kevin Leake, who arrived on scene to advise on the situation.   (Ex 3, at 05:18:50).   Once Brassell considered all the facts known to police after the gun was found, he explained that believed they should not have searched for the weapon because the defendant did not have immediate access to it when he was detained, and it was not in plain sight.   (Ex 4, at 05:24:00).   Brassell also stated that if officers did not have permission to search the house, then the defendant should have been taken to the Felony Response Unit of MPD, who would then have had to obtain a search warrant for the weapon.   (Ex 4, at 05:28:15).   Leake agreed with Brassell that Felony Response should have been contacted and that they would have been responsible for securing a warrant to search for the gun. (Ex 4, at 05:32:23).   Regardless, the defendant was still arrested and charged with aggravated assault.   *Id.*

# ARGUMENT

**A) Julia Saine Had Apparent Authority To Give Police Consent To Search The Apartment**

The Fourth Amendment protects citizens from unreasonable and warrantless searches and seizures by the government. U.S. Const. amend. IV. A person "is entitled to be free from unreasonable governmental intrusion" wherever he or she has a "reasonable 'expectation of privacy.'" *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967)). The remedy for defendants who have had their Fourth Amendment Rights violated is to exclude all evidence obtained as a result of that violation. *See Terry*, 392 U.S. at 12–13. A search of one's home is per se unreasonable where police do not have a valid search warrant, unless the search falls into one of the "few exceptions." *Kyllo v. United States*, 533 U.S. 27, 31 (2001).

One of the narrow exceptions to a warrantless search of a home is when police obtain consent to search the premises. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "Valid consent may be given not only by the defendant but also by 'a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *United States v. Morgan*, 435 F.3d 660, 663 (6th Cir. 2006) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974). Even where a consenting third party does not have actual common authority over the premises, the consent may still be valid if apparent common authority is present. *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990)). Apparent authority exists where the all the facts known to police at the time of the search would "'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." *Rodriguez*, 497 U.S. at 188 (1990) (quoting *Terry*, 392 U.S. at

21–22). The Sixth Circuit has further held that a girlfriend may have apparent authority to consent to the search of a defendant's home even though she only lived at the residence some of the time and had been kicked out earlier in the day. *See United States v. Penney*, 576 F.3d 297, 307 (6th Cir. 2009); *United States v. Clay*, 630 F. App'x 377, 383 (6th Cir. 2015) (unpublished decision).

In *Penney*, the defendant, Terry Penney, had an on-again-off-again "tempestuous relationship" with his girlfriend, Devota Bowman, for a 6-year period. 576 F.3d at 301, 307. The police were called to Penney's residence on "'numerous occasions' when the relationship . . . turned violent" and were familiar with both parties. *Id.* at 301. When the two were broken up Bowman would live at her mother's home, but when they were together, she would live with Penney at his house. *Id.* at 307. On August 2, 2003, Penney kicked Bowman out of his residence after an incident where police were called to Penney's house for another domestic disturbance. *Id.* Police testified that they did not believe Bowman was living with Penney after the August 2 incident. *Id.*

On August 19, 2003, Bowman hitch-hiked barefoot to the police station to file a complaint against Penney for assault. *Id.* at 301. She informed officers that she had moved back into the defendant's residence the day prior and was kicked out the following morning. *Id.* at 307. While she was talking with police, Penney appeared at the station as well and "demanded that police remove Bowman from his residence." *Id.* at 301. Instead, the police arrested Penney for assault and Bowman gave police details about the hidden drugs in Penney's house. *Id.* Police then asked for Bowman's consent to search the house which she gave by signing a consent form. *Id.* Once at the residence, Bowman led officers through the house as she picked up her "clothing and personal items" and put them into "several bags" while simultaneously "pointing [out] various

8

items of contraband" to the police.  *Id.* at 301, 307.  "Officers uncovered numerous guns, cash, scales, and narcotics, removing some of these items from unlabeled, unlocked containers."  *Id.* at 301.

The Sixth Circuit, which reviewed "the district court's legal conclusions *de novo*," upheld the district court's decision to deny the defendant's motion to suppress the contraband as fruits of an illegal search since Bowman had apparent authority to consent.  *Id.* at 306–07.  The court explained that officers observed "several bags" worth of her clothes and "personal items" throughout the house and Bowman's also possessed intimate knowledge of where the defendant had the contraband.  *Id.* at 301, 307–08.  Bowman also told police that she cared for Penney's backyard chickens when he was away, "took care of things around the house," and wrote the defendant's checks.  *Id.* at 308.  All these things taken together gave officers a reasonable belief that Bowman had apparent authority to consent.  *Id.* at 307.

The Sixth Circuit also explained that it did not matter that Bowman listed a different address as her residence on the complaint form for the assault.  *Id.* at 308–09.  The court noted that "the absence of formalized property rights does not automatically translate into the absence of common authority."  *Id.* at 309 (citing *Matlock*, 415 U.S. at 172 n. 7).  The court even went as far to say that the fact the defendant demanded police remove Bowman from his residence was inconsequential since police were aware the couple would constantly break up and get back together and that Bowman would live at the residence whenever they were dating.  *Penney*, 576 F.3d at 309.  "Lovers' quarrels and reconciliations are as much of a 'reality in today's world' as is cohabitation without 'legal formalities,' and the police cannot be faulted for not presuming that a particular quarrel put an end to the couple's relationship and living arrangements."  *Id.*

9

As the victim in *Penney* had apparent authority to consent, so too did Saine.  *See id.* at 307.   Like the defendant in *Penney*, the defendant in the instant case, Alford, was in a relationship with someone who accused him of an assault.   *See id.* at 301.   Saine told police prior to the search that the two were in a sexual relationship.   Alford even told police that while they had not been together for very long, they had known each other for years.   The police also saw Saine with a shower cap on while collecting personal items from the residence such as a towel, a hairbrush, deodorant, a tampon, a large bottle of Vagisil, other non-travel-size toiletries which all tended to show she had been staying at the residence for an extended period.   In addition, she had enough property in the house to warrant packing it all away in three bags.   *See id.* at 308 (discussing how a girlfriend with apparent authority to consent collected her personal items into "several bags" as she packed up to leave the defendant's house).

Saine's exact first words to police when they arrived on scene were, "It's his house. He put me out, but he pulled a gun out on me and everything."   The phrase "he put me out" is indicative of someone being evicted from a living situation.   The Sixth Circuit noted in *Penney* that "[l]overs' quarrels" are common and it is not unreasonable for police to believe that a particular fight did not terminate a "couple's relationship and living arrangements" even when the person in the relationship who owns the residence asks police to evict the other person.   *Id.* at 309.   Hence, even though police knew Alford wanted Saine gone from his house, that was not dipositive in determining whether she had apparent authority over the residence.   Furthermore, despite the fact police in the instant case were not as intimately familiar with the tumultuous relationship between the couple as the officers in *Penney* were, Alford nonetheless told the police that he and Saine had known each other for years just as the couple in *Penney*.   *See id.* at 301.   The dispatcher had also

10

informed officers that the police had called to 255 Flynn Road "previously regarding the same subject."   Thus, police were aware that Alford and Saine had some kind of longstanding relationship and were not newly acquainted.

Just as the girlfriend's knowledge of the contraband in the defendant's house in *Penney* was indicative of her apparent authority, so too was Saine's knowledge about the gun in Alford's room.   *See id.* at 308–09 (discussing how a girlfriend's knowledge that a container in the defendant's house contained narcotics was evidence of her being more than an overnight guest). While Saine incorrectly told officers that the firearm was hidden in the top drawer of the defendant's dresser, she did lead officer to the gun's box.   She was able to show officers that the gun box was on top of the dresser behind a television and other items.   It is reasonable for the police to have believed that the gun was originally in the top drawer when Saine saw Alford grab it, but he changed the hiding place to underneath the bed when he realized the police were on their way.   Regardless, Saine knew Alford had a gun in the room and where the gun's box was specifically kept.

Given Saine's knowledge of the property in the bedroom, the types personal items and toiletries she was collecting, the amount of items she was gathering into three bags, her wearing a shower cap at the rooming house, her claim that she was in a sexual relationship with Alford, her statement that she was being "put out," the early morning hour that Alford was forcing Saine to leave, and the dispatcher telling the responding officers that police had been called to the address "previously regarding the same subject," the officers reasonably believed that Saine possessed common authority over Alford's residence.   As such, the firearm discovered under the mattress should not be suppressed as fruit of the poisonous tree.

11

**B)** **The Defendant Was Not Actively Present And Objecting To Police Entering His Apartment**

Alford was not actively present and objecting to police entry into his home and therefore did not invalidate Saine's verbal consent to search.  *See Georgia v. Randolph*, 547 U.S. 103, 114 (2006) (explaining how one co-tenant's consent is not valid if the other co-tenant is present and objecting).   The Sixth Circuit has rejected to extend the rule laid down by the Supreme Court that a present and objecting co-tenant invalidates another co-tenant's consent to a search.  *See Penney*, 576 F.3d at 309 (quoting *Randolph*, 547 U.S. at 114).   The Sixth Circuit reasoned that *Penney* was distinguishable from this rule because the defendant was not present and actively objecting at the house when the search was conducted.  *Penney*, 576 F.3d at 309.   The court noted "when [a] 'potential objector is nearby but not invited to take part in the threshold colloquy, . . . that potential objector loses out, and the search will be deemed valid.'"   *Id.* (quoting *United States v. Ayoub*, 498 F.3d 532, 537 (6th Cir.2007)).   Furthermore, the Supreme Court has held that "an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason" even when the occupant was removed from the premises by police. *Fernandez v. California*, 571 U.S. 292, 303 (2014).   Hence, even though police detained Penney away from the residence, it did not invalidate the apparent authority of Bowman to consent.   *See Penney*, 576 F.3d at 309.

The fact that it was police action that prevented Alford from being present at the residence to object did not invalidate the Saine's apparent authority to consent since he was legally detained. *See Fernandez*, 571 U.S. at 303.   Alford was legally and forcibly removed from the front porch of his residence because officers observed him yelling at Saine, he refused to comply with police

12

requests to step down from the porch, officers had reason to believe he was armed because of the information they had from the dispatcher, and officers had probable cause to make an arrest since the dispatcher informed them the 911 operator heard him threaten to shoot her in the face.   *See id.* (stating the defendant in *Fernandez* did "not contest the fact that the police had reasonable grounds for removing him from [his] apartment so that they could speak with . . . an apparent victim of domestic violence, outside of [his] potentially intimidating presence").   In addition, the defendant never objected to the police entering the house.   He repeatedly yelled to the officers that the house was his, but he never unequivocally told the police that they could not enter the residence while on the front porch.   Hence, because Alford did not " take part in the threshold colloquy," *Randolph*, 547 U.S. at 111, and never even objected to the police's entry into the home, Saine's apparent authority to consent was not invalidated.

### C) Only The Information Known To Police Before They Found The Firearm Affected Whether Julia Saine's Consent Was Valid

The Sixth Circuit held in *United States v. Rogers* that when determining if someone has apparent authority over the premises, "the key question is whether, after considering all facts known to the officers, they could reasonably conclude that a third party has 'common authority' over the residence—even if later discovered facts show that the third party lacked that authority." 861 F. App'x 8, 20 (6th Cir. 2021) (unpublished decision) (citing *Gillis*, 358 F.3d at 390–91).   In *United States v. Purcell*, the Sixth Circuit ruled that "apparent authority cannot exist if there is ambiguity as to the asserted authority and the searching officers do not take steps to resolve the ambiguity."   526 F.3d 953, 964 (6th Cir. 2008).   The court further held that "when a situation

starts as unambiguous but subsequent discoveries create ambiguity, any apparent authority evaporates." *Id.* The rule of later discovered facts from *Rogers* is distinguishable from the ambiguity rule in *Purcell*. The facts and circumstances that created ambiguity and destroyed the apparent authority of the consenting party in *Purcell* were made known to law enforcement *before* they had found narcotics in a warrantless search of a duffle bag. *See id.* at 955–58, 963–64.

In the present case, even though Sergeant Leake and Officer Brassell stated their belief that the search was illegal, their conclusions were based off contextual information obtained after the firearm was recovered. Prior to finding the weapon, Saine told Brassell that she was sexually active with Alford. Saine only changed her former claim of being in a sexual relationship with Alford after the search was conducted. Furthermore, Saine only revealed that she did not live at 255 Flynn Road after the search was completed, the gun was found, and everyone had exited the residence. In addition, the belief in Saine's apparent authority still would have been reasonable even if the officers knew that she did not use 255 Flynn Road exclusively as her home address because "cohabitation need not be uninterrupted to support a reasonable belief in common authority." *See Penney*, 576 F.3d at 308 (citing *Gillis*, 358 F.3d 386). From the officers' discussions amongst themselves, they appeared to have been treating this case as a domestic disturbance until after the firearm was found, Saine stated she did not live at the rooming house, and the recanting of her statement about the sexual relationship with Alford.

In light of the nature of the personal and intimate items police saw her collecting, the amount of property she had in the house, her knowledge of the firearm in the room and the gun box's specific location, the fact that she admitted to being sexually active with Alford, and the extended length of time she and Alford had known each other, it was reasonable for officers to

14

conclude that Saine had common authority to consent to the search.   All of these facts and circumstances taken together created an unambiguous appearance that she resided at 255 Flynn Road as a co-habitant with Alford.   *See Purcell*, 526 F.3d at 963–64.   None of the information obtained by police after the search is relevant for determining whether Saine had apparent authority.   As such the gun should not be suppressed as fruit of the poisonous tree.

**D)** **Even If Julia Saine's Consent Was Invalid, The Gun Still Should Not Be Suppressed Because It Was Inevitably Discoverable**

The inevitable discovery doctrine states that "since . . . tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.   *Murray v. United States*, 487 U.S. 533, 539 (1988). "The inevitable discovery exception to the exclusionary rule applies when the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered."   *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995) (emphasis in original).   "Compelling facts" exist when the government can show "that the tainted evidence inevitably would have been discovered through lawful means 'by establishing that, by following routine procedures, the police would inevitably have uncovered the evidence.'"   *Id.* at 500 (quoting *United States v. Ramirez–Sandoval*, 872 F.2d 1392, 1399 (9th Cir.1989).   "Thus, there are two elements the Government must meet: first, that the illegally discovered evidence would have been discovered in a later legal search, and, second, that the second search would have inevitably occurred despite the first."   *United States v. Abrams*, No.

2:19-cr-20166-SHL, at *18–19 (W. D. Tenn. Nov. 11, 2019) (order denying a motion to suppress) (citing *United States v. Chapman-Sexton*, 758 Fed. Appx. 437, 441 (6th Cir. 2018) (unpublished decision); *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002)).

Had the officers in this case not gone in and immediately searched for the weapon, police would have obtained a warrant to search the defendant's room for the gun in the course of their routine procedures.  Brassell stated that, without consent to search, the defendant should have been taken to the Felony Response Unit, who would then have been responsible for getting a search warrant.   Leake later confirmed that this was the correct protocol.   Police had probable cause for a warrant to find the gun because the 911 operator heard Alford threaten to shoot Saine and Saine told police that he pointed a gun at her while he was in his room.   Therefore, the firearm should not be suppressed, because, even if Saine's consent to search the room was not valid, police *would* have obtained a search warrant and found Alford's firearm underneath the mattress.

**E)** **The United States Declines to Respond To The Portion Of Defendant's Motion To Suppress Seeking To Exclude The Defendant's Statements Made While He Was Detained In The Back Of A Police Car**

The United States does not intend to use any of the statements made by the defendant while he was detained in the back of a police car at the scene in its proof for this case.   Therefore, this issue is moot, and the United States is not responding to the defendant's argument for the suppression of the defendant's statements while he was detained in a squad car at 255 Flynn Road. However, the United States reserves its right to use any and all suppressed evidence, when applicable, to impeach the defendant.  *See Walder v. United States*, 347 U.S. 62, 65 (1954)

16

(holding that a defendant cannot "turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths").

# <u>CONCLUSION</u>

For the aforementioned reasons, the United States respectfully submits that the Defendant's Motion to Suppress should be denied.

Respectfully submitted,

JOSEPH C. MURPHY
Acting United States Attorney

/s/ *Nathan A. Vrazel*
NATHAN A. VRAZEL
Special Assistant U.S. Attorney
167 N. Main, Suite 800
Memphis, Tennessee 38103
Telephone: (901) 544-4231

18

<u>CERTIFICATE OF SERVICE</u>

I, Nathan A. Vrazel, Special Assistant United States Attorney for the Western District of Tennessee, hereby certify that a copy of the foregoing pleading was forwarded by electronic means via the Court's electronic filing system.

This date: November 15, 2021.

<div style="margin-left:50%">

s/ <u>*Nathan A. Vrazel*</u>
NATHAN A. VRAZEL
Special Assistant United States Attorney
167 N. Main, Suite 800
Memphis, Tennessee 38103
Telephone: (901) 544-4231

</div>

# EXHIBIT 1

# EXHIBIT 2

# EXHIBIT 3

# EXHIBIT 4