IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br>   Plaintiff, )<br>)<br>v. )<br>)<br>COURTNEY ALFORD, )<br>   Defendant. )<br>) | Case No. 2:21-cr-20193 |

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**

On October 13, 2020, Memphis Police Department ("MPD") officers found a gun in Defendant Courtney Alford's room during a search they performed after Julia Saine, Alford's friend and guest, informed them of its presence and beckoned them to enter his residence. Alford was indicted under 18 U.S.C. § 922(g)(9) for knowingly possessing a firearm after being previously convicted of the misdemeanor crime of domestic violence.  (ECF No. 1.)  He moves to suppress evidence of the discovered gun, asserting that the officers violated his Fourth Amendments rights by entering and searching his room without consent.  (ECF No. 24.)  The Government contends, however, that the gun is admissible because the officers reasonably relied on the consent Saine provided.

Before the Court is Alford's Motion to Suppress, (ECF No. 24), and the Government's Response.  (ECF No. 26.)  An evidentiary hearing was conducted on December 8, 2021.  (ECF No. 31.)  At the hearing, the Government offered into evidence the 911 call Saine placed during the October 13 incident, the local dispatch radio call made in response, as well as video footage

from Officers Farrell Brassell and Jacob Martin's body cameras, which also captured the events of that evening. (ECF No. 32.) Neither the Government nor Alford assert that the officers possessed a valid warrant to conduct the searches. Thus, the Court focuses its analysis on whether the Government obtained valid consent to search Alford's residence. For the following reasons, the Court finds that the officers entered Alford's residence without valid consent in violation of the Fourth Amendment, and the doctrine of inevitable discovery does not save the day. Thus, the Court **GRANTS** Alford's Motion to Suppress.

## BACKGROUND

On October 13, 2020, around 4:45 A.M., MPD officers were dispatched to Alford's residence at 255 Flynn Road, Memphis, TN, in response to Saine's 911 Call. (ECF No. 26 at PageID 51.)[1] 255 Flynn Road is a multiple-unit rooming house where Alford rents a single room. (Id. at PageID 54.) During the call, Saine alleged that Alford was forcefully removing her from his home and threatened to shoot her and the police on the scene. (Ex. 1, Saine's 911 Call ("911 Call.")) Saine also informed the 911 operator that the police had been called to Alford's residence before in response to a recent altercation he had with a different woman. (Id.) The local police dispatcher relayed information from Saine's 911 call to MPD officers, including the fact that the 911 operator allegedly overheard Alford threaten Saine and the police officers who may respond to the emergency call. (Ex. 2, Police Dispatch Radio Call ("Radio Call."))

When Officers Martin and Brassell arrived at the scene, wearing police body cameras,[2] they observed Alford and Saine engaged in an explosive argument. (Ex. 4, Officer Brassell

---

[1] The following facts are taken from Defendant's Motion, the Government's Response, testimony from the suppression hearing and exhibits.

[2] Officer Brassell and Martin's body camera footage captured the events that occurred at the scene, including their entrance and search of Alford's home. Footage from both body cameras were reviewed during the December 9, 2021 suppression hearing.

Body Camera Video ("Brassell Video.")) Alford stood in the threshold of 255 Flynn Road's front entrance, propping the door open with his body. (Id.) The officers noticed Saine standing just inside the door, wearing what appeared to be a shower cap and carrying a purse. They also observed her gathering her personal belongings, such as feminine products and toiletries, from the floor and placing them inside a single, plastic bag. (Id.) During the suppression hearing, Officer Brassell testified that the plastic bag was a garbage bag full of clothes while Officer Martin testified that the plastic bag was akin to a convenience store bag that could not hold more than one week's worth of clothing. (ECF No. 31.) As the officers approached Alford and Saine, Saine stated "this [Alford's] house. He put me out." (Brassell Video.) Alford confirmed that the residence was his home and that he had repeatedly asked Saine to leave. (Id.) Officer Martin assured Alford that he and Brassell would remove Saine from the premises and directed Alford to "calm down." (Ex. 3, Officer Martin Body Camera Video ("Martin Video."))

As the officers reached the front steps, they asked about the alleged gun's whereabouts. (Brassell Video.) Though Alford stated there was no gun, Saine insisted that there was one in his bedroom and invited the officers to enter Alford's residence so that she could "show [them] where" it was located. (Id.) Alford waved his hands back and forth in response to Saine's invitation, stating that he "did not care what she is talking about." (Id.)

Saine continued to gesture toward the officers, repeating "let me show you." (Id.) Alford responded by telling Saine "you can go somewhere with all that," still shaking his head and waving his hands. (Id.) When Brassell asked Alford who Saine was to him, Alford answered that he had known her for years, but the two had only gotten "together" three or four days ago. (Id.)

3

After making these remarks, Alford asked the officers to escort Saine from his residence as she was still standing inside the rooming house's entry hallway, beckoning the officers to enter. (Id.) Rather than escort Saine from the premises, Officer Brassell instructed Alford to keep his hands out of his pockets, step away from the door and into the front yard where Officer Martin stood. (Brassell Video.) Alford did not comply with Brassell's direction to step into the front yard, reasserting that the residence was his home and that he wanted Saine removed. Brassell then grabbed Alford and forcibly brought him into the front yard. (Id.) The officers handcuffed Alford and detained him. (ECF No. 26 at PageID 26.) At some point, Officers Anthony Weeden and Courtnee Chrestman arrived on the scene and assisted with Alford's detention. (Id.)

Although Officer Brassell testified during the suppression hearing that he understood Alford's hand-waving gestures to mean that Alford wanted the officers to help Saine gather her belongings and leave his home, he entered the residence and followed Saine into Alford's bedroom to conduct the first search. (ECF. 31; Brassell Video.) Saine told Officer Brassell that Alford had placed the gun in his top dresser drawer; however, Brassell did not find a gun there. (Brassell Video.) While in the bedroom, Brassell noticed Saine retrieving more of her personal items from the floor. (Id.) At this time, Brassell asked her about the nature of her relationship with Alford. (Id.) Saine informed Brassell that she and Alford were friends. Brassell then asked whether she and Alford were "sexually involved," and she stated that they were. (Id.)

Because the search failed to produce any evidence of a gun, Brassell directed Saine to step outside of Alford's room. (Id.) As they both exited, Saine insisted that there was in fact a gun and that Brassell should look "all over the room" to find it. (Id.) Saine then led officers Martin, Chrestman, and Brassell back into Alford's room for a second search. (Brassell Video.)

4

During this search, Saine scoured the room until she found an empty gun case behind Alford's television. (ECF No. 26 at PageID 55.) Saine showed the officers the case to prove that she was not lying about Alford's gun possession. (Id.) The officers then searched through Alford's entire room and eventually discovered a gun under his mattress. (Id.)

After discovering the gun and exiting Alford's home, the officers expressed doubts about the legality of their search and confusion about whether to classify the altercation between Alford and Saine as a domestic violence dispute because the nature of their relationship was unclear. (Brassell Video.) Upon reviewing what appeared to be a police officer manual, Officer Brassell stated that he believed the officers "probably did do an illegal search." (Id.) When Officers Brassell and Martin re-inquired about Saine's relationship with Alford, she recanted that she had been sexually involved with him and reiterated that the two were just friends and that she was only visiting. (Martin Video.)

After the police report was completed, Sergeant Kevin Leake arrived. (ECF No. 26 at PageID 56.) Once Officer Brassell considered the circumstances, he explained that he believed the officers should have not searched Alford's home for the gun because it was not in his immediate possession or plainly visible to the officers. (Id.) Instead, according to the Government, the officers later determined that they should have taken Alford to the Felony Response Unit, to initiate the process of obtaining a search warrant. (Id.) However, during the suppression hearing, Officer Brassell testified that, had the officers not conducted the two searches, the appropriate course of action would have been to complete a police report, based on information available to the officers, and arrest Alford without contacting anyone further about the October 13 incident. (ECF No. 31.) Significantly, neither Officer Brassell nor any other

5

officer testified that they would have attempted to obtain a search warrant because that was police department policy.  (Id.)

## ANALYSIS

Defendant Alford moves to suppress evidence of the gun discovered by MPD officers in his room as well as any alleged statements he made to the officers about the gun while under custodial interrogation, arguing that (1) the officers illegally entered and searched his room and (2) failed to read his Miranda warnings after he was taken into custody yet still asked about the gun found in his home.  As for the search, the Government asserts that the MPD officers properly obtained third-party consent to search Alford's room from Saine and that the gun would have inevitably been discovered anyway because Alford's alleged threats gave the officers probable cause to obtain a search warrant.  As for Alford's alleged incriminating statements, the Government states that it does not intend to offer those statements into evidence in this case.  For the reasons stated below, the Court agrees with Alford and **GRANTS** the Motion.

**I.    Search**

The Fourth Amendment entitles individuals to a reasonable expectation of privacy in their homes and protects them from unreasonable searches and seizures.  U.S. Const. amend. IV. Police searches that are conducted with the searched party's voluntary consent are nonetheless constitutional, and any evidence discovered during those searches is generally admissible. Schneckloth v. Bustamonte, 412 U.S. 218, 245-46 (1983).  This is true even if a third-party, with common authority of the place to be searched, consents.  United States v. Purcell, 526 F.3d 953, 962 (6th Cir. 2008).  Nonetheless, if the person to be searched actively objects to that third-party's consent, then it is no longer valid.  Georgia v. Randolph, 547 U.S. 103, 114 (2006).  On the other hand, should police officers, through an independent search conducted through some

other legal means, discover incriminating evidence, that evidence will be admitted under the inevitable discovery doctrine even if the searched party actively objects.

Here, the Government relies on two theories: first, it contends that Saine consented to the search and she had the apparent authority to do so, and, second, that even if she did not have apparent authority to consent, the police would have obtained a search warrant and found the gun. Both theories are examined below.

### A.    Third Party Consent- Apparent Authority

First, in response to Alford's Motion, the Government relies on Saine's consent to search Alford's room, contending that she had the apparent authority to provide consent. A police officer's search of an individual's home is per se unreasonable where the officer does not possess a valid search warrant. Kyllo v. United States, 533 U.S. 27, 31 (2001). However, a warrantless search is permissible where the person to be searched voluntarily and freely provides consent. Schneckloth, 412 U.S. at 246 (1983). The person purporting to consent must possess either actual or apparent authority over the item or place to be searched. United States v. Purcell, 526 F.3d 953, 962 (6th Cir. 2008).

In cases involving third-party consent, actual authority exists where the third-party shares joint access or control over the home. Id. Apparent authority, on the other hand, exists where a police officer could reasonably, even if erroneously, determine, based on the facts available at the time of the search, that the consenting third-party had common authority over the premises. Illinois v. Rodriguez, 497 U.S. 177, 188-89 (1990); United States v. Taylor, 600 F.3d 678, 681 (6th Cir. 2010). Common authority rests "on mutual use of the property by persons generally having joint access or control for most purposes. . ." Id. at 181 (quoting United States v. Matlock, 415 U.S. 164, 171, n. 7 (1974)). The burden of establishing that apparent authority

rests on the State. Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). While the Fourth Amendment's reasonableness standard does not require officers to make accurate determinations about what a search will produce, ambiguity regarding the consenting party's ownership or control of the home to be searched erases any apparent authority that party may have possessed. Illinois, 497 U.S. at 184; Purcell, 526 F.3d at 964.

Alford argues that "it is clear" Saine did not live at 255 Flynn as she expressly asserted to both the 911 operator and the officers at the scene that she was at Alford's home and that he was demanding that she leave. (ECF No. 24 at PageID 46.) Moreover, Alford argues that his repeated requests to have Saine removed from the premises and the officers' later acknowledgement that they had conducted an illegal search show that they knew Saine did not possess actual or apparent authority.

The Government contends that Saine had apparent authority to consent to the search because the officers reasonably believed that Alford and Saine were in a sexual relationship and that he was actively evicting her from their shared home. According to the Government, this belief was enough to legally validate the officers' search because "a girlfriend may have apparent authority to consent to the search of a defendant's home" even if she only lived with a defendant briefly and had been evicted from the home before the start of the search. United States v. Penney, 576 F.3d 297, 307 (6th Cir. 2009).

In Penney, the local police department knew that the defendant and his "off and on" girlfriend had been involved for approximately six years, and that the girlfriend lived with the defendant when they were "on" because of the numerous visits officers made to the defendant's home in response to domestic violence calls. Id. at 301. During the officers' most recent visit to defendant's home, they learned that the defendant had evicted the girlfriend from his home after

8

the couple, yet again, ended their relationship. Id. However, about three weeks later, the girlfriend arrived at the local police station to complain that the defendant had assaulted her. Id. While she was at the station, the defendant also arrived and demanded that police remove her from his home. Id. The police arrested the defendant and transferred him to the county jail. Id.

The girlfriend then provided the officers with written consent to search the defendant's home after she informed them that the two had recently reconciled. Id. at 307. During the officers' search of the home, they saw evidence that suggested the girlfriend had in fact reentered as a cohabitant. Id. For instance, as the girlfriend led officers through the home, they observed her gathering her personal items and clothing from various places such as the laundry basket, dresser drawers and washing machine. Id. Moreover, the officers noted that the girlfriend had personal knowledge of where the defendant stored narcotics, guns, cash, and other items of contraband. Id. at 308. Though the defendant later objected to the officers' search, the court found, in relevant part, that the search was constitutional because the girlfriend had the apparent authority to consent. Id. at 310.

In reaching their decision, the court found that it was reasonable for the officers to believe that the girlfriend had common authority over the home because of the officers' longstanding knowledge of the couples' relationship and intermittent cohabitation. Id. at 308. Specifically, the court found that the facts known to the officers at the time of the search "warranted" their reliance on the girlfriend's consent, including that: (1) the couple had been involved in an off-and-on relationship for approximately six years (2) the girlfriend lived with the defendant when the relationship was "on" (3) the girlfriend had informed the officers that she and the defendant had recently reconciled and (4) her personal effects, including her car, were at the defendant's home. Id. at 307-08. According to the court, these facts objectively showed that

9

the girlfriend "enjoyed [joint] access to the premises for most purposes" and thus had apparent authority to consent to the search. Id. at 308.

The Penney court rejected the defendant's contention that his demand to the officers to remove the girlfriend from his home put them on notice that the couple no longer lived together. Id. at 308-09. Though the court confirmed that it may not be reasonable to believe that a live-in partner retains common authority over a residence once an occupant with formal, legal authority over the home takes unambiguous steps to remove that partner, the court also emphasized that the reasonableness of an officer's beliefs "is evaluated in the light of all particular facts known to the officers." Id. at 309. Given the fact that the officers knew of the couple's fraught history, the girlfriend reported that she and the defendant had recently reconciled and the officers observed her personal belongings scattered among his, the court concluded that these facts were enough to establish that the girlfriend, at the very least, had apparent authority to consent.

Here, the Government correctly argues that a "live-in girlfriend" may have common authority over a home that she shares with "a boyfriend." See United States v. Grayer, 232 Fed. Appx. 446, 449 (6th Cir. 2007); United States v. Hudson, 405 F.3d 425, 442 (6th Cir. 2005); United States v. Gillis, 358 F.3d 386, 391 (6th Cir. 2004). However, the question in this matter is whether the facts available to the officers at the time of the search warranted a reasonable belief that Saine and Alford were cohabitating partners. The Government argues that the facts do establish that Saine had apparent authority based on (1) Saine's knowledge of the gun's whereabouts (2) the types of clothing and personal items the officers observed her wear and gather from Alford's home and (3) the claims both made to the officers about the nature of their relationship. However, the record reflects that none of these conclusions were reasonable.

10

In essence, this matter is not the same as Penney. First, and importantly, these officers were not privy to a longstanding history of cohabitation between Alford and Saine. Though police dispatch notified the officers that police had recently responded to a previous 911 call regarding Alford and a similar altercation, the officers were aware that that altercation involved a different woman. When they arrived on the scene, Saine immediately asserted, and Alford confirmed, that the home belonged to him and that he wanted her removed. While the Government takes the position that Saine's statement, "he put me out," indicated that she lived in the home and was being evicted, the officers, based on their body camera footage, do not seem to share this interpretation. Indeed, Alford asked the officers to remove Saine from his residence, Officer Martin is captured reassuring Alford that they were "going to get her out of [his] house." (Brassell Video.)

Second, unlike Penney, Saine did not know where the gun was. Officer Brassell ended the first search after finding no evidence of a gun in Alford's top dresser drawer, the location where Saine vehemently insisted Officer Brassell would find it. Thus, as that point, Saine's connection to the room was highly ambiguous. She then beckons the officers to conduct a second search, not because she suddenly recalled the gun's exact whereabouts, but instead because she believed the officers were not thorough in their search. It is during this second search that Saine finds the gun case and the officers, eventually, find the gun. In essence, she displayed no knowledge of where the gun was but rather kept pushing officers to look to find it.

Third, the Court does not find that the officer's observance of Saine's personal belongings and attire during the incident "indicated" that she resided at Alford's home. As Officer Martin testified, Saine was seen carrying a plastic bag akin to a convenience store bag that could not hold more than one week's worth of clothing. This bag can be seen on the video

11

as well, and the Court questions whether it would hold even that much clothing. Saine had no suitcase or luggage, and retrieved no personal belongings from Alford's dresser, closet or laundry basket. Instead, the officers saw her gathering her belongings from the floor and 255 Flynn's entry hallway. Moreover, even though the Penney court found the girlfriend's barefoot arrival at the jail station supported her claim that she lived with the defendant, who had suddenly evicted her before she had time to collect her shoes or other belongings, here, the Court is not persuaded that Saine's attire and presentation, specifically her "shower cap," conveyed a similar message.

Additionally, the Court is not convinced that Saine's initial claim to Officer Brassell that she was sexually involved with Alford reasonably warranted a belief that she was also his cohabitant. Before the officers arrived on the scene, local dispatch informed them that Saine was involved in an altercation with a "friend." (Ex. 1, Radio Call.) When Officer Brassell asked Alford about the nature of his relationship with Saine, he replied that they "got together" only a few days earlier. The fact that Alford also stated that he had known Saine for years does not convert their brief involvement into an intimate partnership involving cohabitation. Saine herself told Officer Brassell that she and Alford were friends before he conducted the first search. Thus, although Officer Brassell understood Saine's alleged sexual involvement with Alford to mean that the two were in a relationship, the Court does not find this was a reasonable conclusion to draw considering the information he had received from dispatch, Alford and Saine before he conducted the first search. At the very least, the situation was ambiguous, particularly as to Saine's authority to consent to a search.

The discussions among the officers after the gun was discovered highlight the ambiguity concerning the officers' understanding of Alford's relationship with Saine. The Fourth

12

Amendment's reasonableness standard does not require that officers correctly determine whether a third-party does in fact have apparent authority to consent to a search. See Illinois, 497 U.S. at 184 ("'[R]easonableness,' with respect to this necessary element, does not demand that the government be factually correct in its assessment that that is what a search will produce.'"). However, ambiguity regarding a third-party's right to consent destroys any apparent authority that party was deemed to possess. Taylor, 600 F. 3d at 684-85. Once ambiguity destroys a third-party's apparent authority, officers may reestablish it by either obtaining a warrant or asking the "would-be-consenter whether he or she possesses the authority to consent to the search" of the property in question. Purcell, 526 F. 3d at 964. Here, the officers took neither route. Although Alford's repeated requests to the officers to remove Saine from his home and her confirmation that the home belonged to him cast obvious doubt on whether she lived there, no attempts were made to obtain a search warrant and none of the officers asked Saine whether she resided at 255 Flynn until after the gun had been discovered. Thus, the Court finds that the Government failed to meet its burden to show that Saine possessed apparent authority.

### B. Objection to Consent

Even if Saine had apparent authority, any consent she provided was immediately extinguished when Alford actively objected to the officers' entry into his home. A third-party's consent is not valid if a potential defendant is present and objecting to a search. Georgia, 547 U.S. at 114.

Alford maintains that he actively and immediately objected to the officers' search when he repeatedly asked them to escort Saine from his residence and shook his head and waved his hands "no" when she beckoned the officers to enter. Further, Alford argues that his statement to

13

Saine, "you can go somewhere with all of that," in response to her invitations to the officers, shows that he expressly objected to the search. (ECF No. 24 at PageID 44, 48.)

The Government, on the other hand, argues that Alford failed to "unequivocally" tell the police that they could not enter his home before he was arrested and any attempt to object after he had been detained in the officers' squad car could not invalidate Saine's consent because he was no longer considered "present" to object. However, during the suppression hearing, Officer Brassell testified that he understood Alford's gesturing to mean that the officers should "help" Saine gather her belongings from 255 Flynn and exit the premises. The Government even admits in its Response that the officers knew Alford wanted Saine removed from his home. (See ECF No. 26 at PageID 60) (arguing that the officers' knowledge that Alford wanted them to remove Saine from his home is not dispositive in this case.) Such an understanding implies that Officer Brassell, at least, knew that Alford, the undisputed resident at 255 Flynn, did not want the officers to search his home. Based on this testimony, and the fact that Alford gestured and made statements before he was arrested and removed from his home, the Court finds that Alford adequately conveyed his objection to the search to the officers even though he did not explicitly state "you may not enter." Thus, even if Saine had apparent authority to consent to the search, which she did not, her consent was defeated by Alford's adamant objection.

  C. **Inevitable Discovery**

The Government argues that, even if Saine lacked apparent authority to consent to the search, evidence of the gun should not be suppressed because the officers would have inevitably discovered it. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means," then that information should be admitted into evidence. Nix v. Williams, 467 U.S. 431, 444 (1984). The

inevitable discovery exception to the exclusionary rule applies when the government can show either (1) the existence of an independent, untainted investigation that would have uncovered the same evidence or (2) some other compelling facts establishing that the disputed evidence inevitably would have been discovered.  United States v. Kennedy, 61 F.3d 494, 499 (6th Cir. 1995).

"The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence."  United States v. Keszthelyi, 308 F.3d 557, 574 (6th Cir. 2002).  However, the Court "must keep speculation" about what an officer would have done "at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment."  Id. The Sixth Circuit has drawn a distinction between evidence that could have been discovered because an officer had probable cause to obtain a search warrant and evidence that would have inevitably been discovered through a search validated by other legal means.

For instance, in United States v. Quinney, 583 F. 3d 891, 894 (6th Cir. 2009), the Sixth Circuit reversed the district court's denial of the defendant's motion to suppress, finding a misapplication of the inevitable discovery doctrine.  In that case, the officers were investigating the defendant on suspicion that he was printing and passing counterfeit currency.  Id. at 893. After obtaining the defendant's consent to search his room and observing a printer, and receiving information from two witnesses that the defendant did in fact print counterfeit bills, the officers returned to the defendant's home and seized his printer without consent or a search warrant.  Id. The court found that, though the officers had probable cause to obtain a search warrant, based on the statements of the two witnesses, their failure to do so before entering the defendant's home and seizing his printer violated his constitutional rights and rendered evidence of the printer

15

inadmissible. Id. at 894. In reiterating "this circuit's commitment to the Fourth Amendment," the Sixth Circuit held that the government could not rely on the inevitable discovery doctrine, under these circumstances, simply because the officers had probable cause, asserting that such a position "would completely obviate the warrant requirement." Id.

Here, the Government argues that, because the 911 operator allegedly overheard Alford threaten to shoot Saine, the officers had probable cause to obtain a warrant to search his home. According to the Government, had the officers not immediately entered and searched his home, they would have taken the necessary steps to obtain said warrant. In support of this contention, the Government points to the officers' conversations after the search, in which they eventually determined that they should have taken Alford to the Felony Response Unit to initiate the process of obtaining a warrant before searching his home.

However, this record does not support inevitable discovery. First, as Quinney demonstrates, probable cause alone does not support a warrantless search. And the officers' realization that they should have obtained a search warrant does not show they would have inevitably done so and then discovered the gun; as this circuit has repeatedly held, such a finding would obviate the warrant requirement, an unacceptable result. See United States v. Johnson, 22 F.3d 674, 683 (6th Cir. 1994) ("[T]o hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause.") Rather, to show that the gun would have been inevitably discovered, the Government must offer evidence of routine procedures the officers would have used regardless of the illegal search. Here, the Government presented evidence to the contrary. Indeed, during the suppression hearing, when the Government questioned Officer Brassell about the steps he would have taken had he not

searched Alford's room, he testified that the officers would have completed a police report and arrested Alford without contacting anyone else in relation to the October 13 incident. Given that Officer Brassell's testimony directly contradicts the speculative conversations he and the other officers had regarding their illegal search of Alford's home, the Court finds that the Government cannot rely on the inevitable discovery doctrine.

## II.     Incriminating Statements

Alford also seeks to suppress any alleged incriminating statements he made when asked about the discovered gun while detained in the back of the officers' squad car, asserting that the officers failed to read him his Miranda warnings. The Government declines to respond to this contention, asserting that it does not intend to use as evidence any statements made by Alford while he was detained. Therefore, the Motion is **GRANTED** as to the alleged statements.

## CONCLUSION

Sufficient ambiguity exists as to whether Saine, Alford's friend and guest, had apparent authority to consent to a search of Alford's home, defeating her ability to provide consent to the searches which occurred here. Moreover, Alford stated his objection to the searches. Thus, the officers illegally entered and searched his room. The inevitable discovery doctrine does not apply because the testimony from the suppression hearing showed that, had the officers not searched Alford's room, no effort would have been made to obtain a warrant. For these reasons, and because the Government does not intend to offer Alford's statements into evidence, the Motion to Suppress is **GRANTED**.

**IT IS SO ORDERED,** this 20th day of December, 2021.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE